# In the United States Court of Federal Claims

No. 13-290C

(Filed:  September 17, 2013)

**\*Opinion originally filed under seal on September 3, 2013**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|   |   |
|---|---|
| | \* |
| ARCHURA LLC, | \* |
| | \*  **Post-Award Bid Protest; Unequal** |
| Plaintiff, | \*  **Treatment; Lack of Prejudice; No** |
| | \*  **Substantial Chance of Award;** |
| v. | \*  **Clarifications; Patent Ambiguity** |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |
| | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Marcantonio Barnes*, Leesburg, VA, for plaintiff.  *Anthony H. Anikeeff* and *William A. Wozniak*, McLean, VA, of counsel.

*James P. Connor,* Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Assistant Attorney General, and *Jeanne E. Davidson,* Director, Commercial Litigation Branch, for defendant.

# O P I N I O N

**FIRESTONE**, *Judge*.

In this post-award bid protest,[1] Archura LLC ("Archura" or "plaintiff") has sued

the United States alleging that the Department of Homeland Security ("DHS,"

"government," or "the agency") abused its discretion and violated the Federal Acquisition

---

[1] Archura originally protested its exclusion from qualification in both the Service-Disabled, Veteran-Owned Small Business ("SDVOSB") and general small business categories, but moved to withdraw its protest with regard to the SDVOSB category, which the court allowed on August 23, 2013.  Order, ECF No. 66.  Plaintiff's SDVOSB claims, as well as the defendant-intervenors, were dismissed from the proceeding, and this opinion focuses solely on Archura's protest of its exclusion from the general small business category.

Regulation ("FAR") when it disqualified Archura's proposal from consideration for an indefinite-delivery, indefinite-quantity ("IDIQ") contract under DHS's FirstSource II solicitation.[2]  Archura was disqualified because it omitted certain brand name/model number information from its Sample Delivery Order Pricing Matrix ("matrix") in contravention of the solicitation, which required offerors to complete every cell in the matrix.  The solicitation also stated that award would be made without discussions and that incomplete proposals were subject to rejection.

Nonetheless, plaintiff now argues that its omission of brand information was minor and that instead of disqualifying Archura, DHS should have given plaintiff the opportunity to correct the error, particularly because some offerors received awards despite submitting unclear brand/model information.  Archura further argues that DHS's negative comments in Archura's debriefing document regarding the large price differential between Archura's total price and the total prices of the FirstSource II awardees ("awardees") should not bar Archura from the relief it seeks.  Archura proposed an overall price of approximately * * * million, which was 29% higher than the highest-priced awardee and 73% higher than the average awardee's price.  Archura contends that it was misled about price due to a latent ambiguity in the solicitation, and that as a consequence, its higher price should not pose a barrier to award.  Archura also argues that in any event, DHS erred by giving too much weight to price in its evaluation of

---

[2] As discussed below, this protest does not involve the award of any particular delivery order under the FirstSource II vehicle.  Rather, plaintiff challenges its non-award of a FirstSource II IDIQ contract.  Without an IDIQ contract, Archura cannot bid on any of the delivery orders that DHS intends to issue under FirstSource II.

proposals.  Archura argues that had DHS properly allowed it to correct the error in its matrix and properly considered price in making the award decisions, Archura would have had a substantial chance of award.

The government argues that DHS did not abuse its discretion by declining to give Archura an opportunity to correct the error in its matrix.  The government further contends that, even if DHS had abused its discretion, Archura was not prejudiced because DHS properly applied the FirstSource II solicitation's unambiguous price instructions, and Archura's extraordinarily high price precluded it from having a substantial chance of award.

The parties have crossed-moved for judgment on the administrative record.  For the reasons below, plaintiff's motion for judgment on the administrative record is **DENIED**, and the government's motion for judgment on the administrative record is **GRANTED**.

## I.  BACKGROUND[3]

### A.  The FirstSource II Solicitation

Beginning in 2011, DHS sought information from potential offerors to replace FirstSource, its agency-wide contract vehicle for a wide variety of information technology ("IT") commodities and value-added reseller services.[4]  AR 1, 194.  The suite

---

[3] Unless otherwise stated, these facts are undisputed and are taken from the amended complaint, exhibits to the parties' moving papers, and the Administrative Record ("AR").

[4] IT value-added resellers provide multi-vendor hardware and software along with significant services to DHS components, including, but not limited to, configuration consulting and design, systems integration, installation of computer equipment, customization of hardware or software, training, product technical support, maintenance, and end-user support.  AR 10.

of contracts awarded in the FirstSource program facilitated streamlined purchase,

delivery, and installation of IT commodity products and solutions, as well as contributed

to the agency's small business and strategic sourcing programs.  AR 184, 194.  The

original FirstSource IDIQ contracts were awarded in fiscal year 2007 to eleven small

business contractors for a period of five years.  The agency sought to further standardize

commodities and procurement processes and reduce acquisition lead-times through

FirstSource II.  AR 9, 194.

On December 27, 2011, DHS issued Solicitation No. HSHQDC-12-R-00005 for

FirstSource II, a five-year follow-on to its predecessor "to establish contracts with

experienced Information Technology Value-Added Resellers to provide a variety of

commercially-available IT commodities, solutions, and value-added reseller services to

support DHS programs in accomplishing their missions."  AR 184 (emphasis in original).

The contract vehicle would allow DHS to access technological advances and new

business practices, while leveraging the significant agency-wide buying power to obtain

the lowest available prices.  AR 194.  One of the Program Objectives indicated DHS

sought to "[o]btain the lowest prices for all products and related services on catalogs

offered by the Contractor as determined through application of fair opportunity and

competition in the ordering process."  AR 195.

The FirstSource II solicitation provided for multiple IDIQ contract awards to

offerors in five small business categories: 8(a); Historically Underutilized Business Zone;

SDVOSB; (4) Economically Disadvantaged, Women-Owned Small Business; and (5)

Small Business.  AR 184, 264.  The contracts would be "mandatory for consideration"

4

within DHS, meaning that contracting officers would have to consider the FirstSource II vehicle for any IT commodities order.  AR 185.  At the delivery order level, contracting officers would use the fair opportunity provisions of FAR § 16.505(b), select one of the five small business categories, and compete the order among firms in that category.  Id. For example, if the contracting officer selected the 8(a) category, only the FirstSource II 8(a) awardees would compete for the order.  Id.  Delivery orders could be issued on a firm fixed price ("FFP") – including FFP with incentives – or a FFP/Time & Materials basis.  AR 214.  Proposals at the delivery order level were required to "include detailed pricing for all resources required to accomplish the effort" and "[t]he Contractor [was] permitted to propose pricing that is lower than originally proposed and established in the contract."  Id.  The prices proposed during the IDIQ contract phase would thus serve as ceiling prices, and the awardees would be free to bid lower on individual delivery orders.

Each contract under FirstSource II would have a five-year base ordering period and two one-year option ordering periods, with a guaranteed minimum amount for each IDIQ contract of $250 per contractor and, with some exceptions, the offer to compete at the delivery order level.  AR 190-91, 213.  The total value of all delivery orders awarded under FirstSource II (including option periods and minimum contract amounts) was not to exceed $3 billion.  AR 191.  The solicitation stated that the IDIQ contracts would be awarded under FAR Part 12 (Acquisition of Commercial Items) using the competitive negotiation source selection procedures of FAR Part 15 (Contracting by Negotiation). AR 185.

DHS planned to conduct separate source selections for each small business category; offerors could submit proposals in all categories for which they were eligible, and could be selected for award in any number of the categories.  AR 258.  Evaluation was based on a best value source selection, with award to the responsible offeror(s) "whose offer(s) conforming to the solicitation will be most advantageous to the Government, price and other factors considered" and with a sufficient number of awards in each category to ensure adequate competition at the delivery order level.  AR 265.

DHS intended to conduct an "integrated assessment of each Offeror's proposal" to determine which represented the best value to the government.  AR 264.  The solicitation referenced FAR Part 2's definition of best value as "the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement."  Id.  It also recognized that "[a]s proposals approach equal ratings as a result of the non-price evaluation, price will become more important in making the award determination" and "award may be made to other than the lowest priced [o]fferor(s) if . . . a price premium is warranted due to non-price merit."  Id.  Similarly, award could be made to other than the highest-rated proposals from a non-price standpoint if the government decided a price premium was not warranted.  Id.

The non-price factors included (1) Corporate Experience, (2) Ability to Achieve Results, and (3) Past Performance.  AR 265.  The first two factors (Corporate Experience and Ability to Achieve Results) were of equal importance, and when combined were more important than the third factor (Past Performance).  Id.  All non-price factors, when

combined, were more important than price, which was not assigned an adjectival rating.
Id.

To conduct its price evaluation, DHS provided offerors a Sample Delivery Order Pricing Matrix consisting of an Excel spreadsheet listing various kinds of equipment and services DHS had procured in the past, including quantities, items, and value-added reseller services for each year of the base period and both option periods.  AR 267, 482. For supplies, the matrix listed approximately 70 types of IT equipment and assorted options for which bidders were required to complete cells[5] with their proposed (1) brand/model names, (2) ceiling prices, and (3) discount rates.[6]  AR 483-500 (listing supply line items).[7]  The agency stated in response to an offeror-submitted question that exceeding the minimum requirements in the Sample Delivery Order Pricing Matrix by offering an improved or particular product "w[ould] not have any effect on an [o]fferor's proposal."  AR 384  ("DHS is not looking for a particular item or manufacturer, but rather items which will satisfy the minimum requirements set forth in the Sample

_____

[5] DHS "locked" the vast majority of the pricing matrix so as to prevent offerors from manipulating cells other than those calling for data input.  DHS yellow-highlighted all of the cells for which pricing data was required in order to aid contractors in identifying each of the items and options that the offerors were required to complete.  See AR 361 ("Only yellow cells may be manipulated, all other cells are fixed.").

[6] When proposing prices, offerors were expected "to offer volume discounts equal or less to those offered under GSA Federal Supply Schedules, or comparable vehicles."  AR 263, 482.

[7] In reviewing these matrices, the court notes that the last worksheet in the sample price matrix, titled "Summary," provides anyone reviewing the matrix with a concise – and automatically populated – list of the brand/model proposed by the offeror for each line item.  See AR 380-81, 499-500.  Thus, if a bidder failed to insert brand/model information into the appropriate cell, the absence of that information would be readily apparent by a cursory review of the Summary worksheet.  See AR Tab 20(b) (Archura Proposal Volume II Price).

Delivery Order Pricing Matrix, which will then be used to generate a total evaluated price.").

DHS based its price evaluation on a "total evaluated price" for each offeror, calculated as the total proposed price for items and labor rates/hours set forth in the offerors' Sample Delivery Order Pricing Matrix. AR 265. Based on data provided by the offeror on these inputs, the spreadsheet automatically calculated price information to be used by the evaluators. AR 267, 482.

Critically, DHS indicated numerous times in the solicitation that the quotes and pricing information offerors provided in the matrix would be designated as ceiling prices/rates for any future orders made under the FirstSource II vehicle. See, e.g., AR 262 ("equipment items and pricing information . . . will be considered as ceiling prices/rates for any orders for those exact equipment items or labor categories"); AR 267 (same); AR 482 ("Once again, the prices/quotes proposed herein are established as ceiling prices for the specific items proposed AND the minimum configurations being sought. Competition at the IDIQ level will ultimately decide the best value to the Government."). The instructions for completing the Sample Delivery Order Pricing Matrix also stated:

> For supplies - the ceiling prices are based on both the minimum requirements/ specifications in the document AND the brand/model proposed by an Offeror. (Two things which are likely to change and vary throughout the life of the contract) . . . When certain specifications or proposed items (brand and model) become obsolete, the established ceiling will carry no weight. The IDIQ level competitions will establish a new market price.

AR 482.  The solicitation further provided that the government would evaluate the pricing matrix for "accuracy, completeness, and reasonableness" and that the government would "use all the information provided in its evaluation."[8]  AR 436.

Although DHS elected to use the source selection procedures found in FAR Part 15, the solicitation made clear that the government intended to make its award based solely on the offerors' proposals and did not intend to engage in discussions.  See AR 264 ("The Government does not intend to hold discussions.  Therefore, all proposal submissions should contain the offeror's best terms from a price and technical standpoint.").  Although the government reserved its discretion to "waive informalities and minor irregularities," AR 253, the solicitation repeatedly warned offerors that failure to conform to the solicitation's instructions jeopardized their chances of receiving an award.  DHS acknowledged that it "anticipate[d] a significant level of competition for FirstSource II" and "strongly encourage[d] interested companies to thoroughly read the evaluation criteria in th[e] RFP prior to preparing a proposal."  AR 185 (emphasis in original).

Both the solicitation and DHS's responses to vendor questions emphasized the importance of providing complete and accurate information in order to be considered for award.  See, e.g., AR 259 ("[The instructions] are designed to ensure the submission of information essential to the understanding and comprehensive validation and evaluation

---

[8] Under the Source Selection Plan, the contracting officer ("CO") was ultimately responsible for reviewing proposals to ensure that the evaluation documentation was complete, accurate, and consistent.  See AR 965.

of proposals.  Clarity and completeness are of utmost importance to the proposal."); AR

264 ("Each [o]fferor is responsible for ensuring that the information provided is

thorough, accurate, and complete."); AR 265 ("Overall accuracy and completeness of the

proposals will be considered."); AR 267 ("The evaluation of the information provided in

the Sample Delivery Order Pricing matrix will include accuracy, completeness, and

reasonableness."); AR 408 (warning offerors that they "are required to submit proposal

responses for all of the products and services set forth in [the pricing matrix]," in

response to a vendor request to submit pricing for only some portions of the pricing

matrix).

Finally, solicitation paragraph E.2.9(2), in a section titled, "Instructions for

Proposal Preparation," stated:

> Offerors are expected to follow the detailed proposal preparation
> instructions fully and carefully.  The Government will rely substantially on
> the information provided by the Offerors to evaluate the proposals.  It is
> therefore imperative that Offerors carefully follow the instructions set forth
> below and submit their proposals in the format and with the content
> specified below, providing all requested information.  Offers that simply
> restate the RFP requirements or that state that the Offeror's proposal is
> compliant with the requirements of the RFP – without providing necessary
> explanation or other data – are not likely to be highly evaluated, if they can
> be evaluated at all.  <u>Proposals that fail to provide all required information in
> the format requested may be found unacceptable and may be rejected
> without further consideration if the [c]ontracting [o]fficer determines that a
> significant revision or addendum to the Offeror's proposal would be
> required to permit further evaluation, and especially if the incompleteness
> of the proposal or errant formatting of the proposal appears to be due from
> a lack of diligence or competence of the Offeror.</u>

AR 258-59 (emphasis supplied).

### B. Archura's Proposal

Archura timely submitted proposals in the SDVOSB and general small business categories; however it omitted the brand/model for one item listed on the Supplies portion of its Sample Delivery Order Pricing Matrix.  For Item 5.4.6, a C4 Certificate Printer,[9] Archura left the box containing the brand/model number empty:

| 5.4.3 | **Large Format Color Printer** |
|---|---|
|  | *Option:* |
|  | *Additional input tray* |
|  | ***Brand/Model:* * * *** |
| 5.4.4 | **Tabloid Color Printer** |
|  | *Option:* |
|  | *Additional large input tray* |
|  | *Output tray expansion* |
|  | ***Brand/Model:* * * *** |
| 5.4.5 | **Plotter** |
|  | ***Brand/Model:* * * *** |
| 5.4.6 | **C4 Certificate Printer** |
|  | *Option:* |
|  | *Additional input tray* |
|  | *Output tray expansion* |
|  | *Envelope Feeder* |
|  | ***Brand/Model:*** |
| 5.4.7 | **Check Endorser** |
|  | ***Brand/Model:* * * *** |

AR Tab 20(b).  It did, however, price the item for the specified quantity of 800 printers at a price of * * * for the five-year base period.  Id.  The C4 Certificate Printers represented approximately * * * of Archura's total evaluated price, which was * * *.  Id.

---

[9] The C4 Certificate Printer is used to print things such as naturalization certificates.  AR 352. Plaintiff asserts that the box should have listed the * * *, which it inadvertently omitted.  AR 522.

### C.  FirstSource II Evaluation and Award

By the time bidding closed in March 2012, DHS had received over 240 proposals from more than 140 bidders across the five small business categories, including 105 proposals in the small business category.[10]  AR 695.  A Technical Evaluation Panel ("TEP") evaluated the proposals, which established the technical ratings for Corporate Experience, Ability to Achieve results, and Past Performance.  A Price Evaluation Team ("PET") independently evaluated the offerors' price proposals in accordance with the source selection plan.  See AR 687-93.  The proposals ranged from a low price of * * * to a high of * * *.  AR 707-10.  The three highest-priced offerors were immediately eliminated as outliers.  AR 706.  Archura was not in the top three and so the TEP and PET evaluated its proposal.  AR 765-68.

The TEP scored Archura's proposal, rating it "Excellent" for Corporate Experience, "Good" for Ability to Achieve Results, and "Excellent" for Past Performance.  AR 687, 689-90.  Three offerors received higher technical ratings than Archura, four offerors received the same, and ninety-seven had lower technical ratings.  AR 703-04.  With regard to price, the PET found Archura's proposed total price was * * *, but that due to the missing brand information in the matrix, the total evaluated price "did not fully meet the requirements per the provisions outlined in Chapter E, Part 3.4, of

---

[10] With regard to the general small business category, 106 offerors submitted proposals. However, one offeror withdrew its bid prior to the source selection decision.  AR 695.

the solicitation."  AR 693.[11]  DHS determined that without this information it "would be unable to hold [Archura] to a ceiling price for any of those particular items."  AR 693.

Within each small business set aside category, numerous offerors were also disqualified for incomplete matrices on the grounds that their Sample Delivery Order Pricing Matrices did not conform to the solicitation's instructions.  AR 965, 1101.  Of the 105 companies that submitted proposals in the general small business category, 9 companies submitted pricing matrices that were so non-compliant that the government could not calculate a total evaluated price.  AR 1101.  Archura was removed from consideration along with 37 other companies failing to include brand/model and/or price information for each item listed in the pricing matrix.  AR 965, 1101.  These proposals were deemed to have "fundamental flaws" and were eliminated from consideration.  See AR 965, 1100-01.

---

[11] The relevant portion of Chapter E, Part 3.4 states at AR 267:

Factor 4: Sample Delivery Order Pricing (to be provided in Amendment 1)

> The Sample Delivery Order Pricing matrix will provide information that will serve as the basis for calculation of the total evaluated price.  Each price proposal will be evaluated, but will not be assigned a rating.  The evaluation of the information provided in the Sample Delivery Order Pricing matrix will include accuracy, completeness, and reasonableness.  The Sample Delivery Order Pricing matrix includes quantities, items, and VAR services for each year of the base period and both of the option periods, and the Government will use all the information provided in its evaluation.  The equipment items and pricing information included in Tab E will be considered as ceiling prices/rates for any orders for those exact equipment items or labor categories; however, DO COs may add equipment items and/or labor categories at the DO level without prior approval from the FirstSource II CO.

After Archura was eliminated from further consideration, the CO prepared a best value recommendation document for each small business category for the Source Selection Authority ("SSA") to use in making awards.  See AR 694.  The CO sorted the proposals in descending order of technical rating combinations, and in the event of multiple offerors with the same ratings, listed those with the lowest price first.  AR 962-65, 1097-1100.  The SSA used this table, along with the full results of the TEP and PET analyses and the best value recommendation document in the source selection.  AR 1100.  The best value recommendation repeated the PET's finding that a pricing matrix lacking complete brand/model information would not satisfy the solicitation's requirements.  AR 767.

On December 21, 2012 the SSA selected fourteen vendors for award in the general small business category.  AR 1096.  In the Source Selection Decision Document, the SSA noted that multiple offerors' price proposals had been found to be "fundamentally flawed" because the companies had failed to conform to the solicitation's requirements.  AR 1100-01.  Specifically, the SSA wrote:

> [T]hese Offerors did not provide brand names, model numbers, or quotes for some or all of the items bid.  The requirement to provide brand names and model numbers for all items bid was set forth in the Sample Delivery Order Pricing Matrix, and the FirstSource II solicitation (Chapter E, Part 2.9) indicated that if all required information was not provided in the requested format, the Offeror might be found to be unacceptable and rejected without further consideration.  This issue was also addressed/emphasized in the Government's responses to vendor questions (page 26) on the FirstSource II solicitation, which were posted to www.fbo.gov . . . Offerors whose price proposals included fundamental flaws (Archura . . . ) did not adhere to the terms and conditions of the solicitation . . . therefore will not be considered for an award.

AR 1100-01 (emphasis in original).

Archura requested a post-award debriefing pursuant to FAR § 15.506(d), which the contracting officer provided in writing on January 11, 2013.  AR 1120-26.  The debriefing repeated that Archura's proposal had not complied with the solicitation's terms because Archura failed to provide all of the necessary information in the requested format.  Additionally, Archura learned at the debriefing that even if the firm's proposal had included all of the necessary information, Archura's price of over * * * million was significantly higher than any of the vendors who were selected for award.  AR 1126.  The debriefing statement concluded "[i]n summary, the combination of a non-compliant price proposal and significantly higher total evaluated price does not represent the best value to the Government, and [Archura] was not selected for award."  AR 1126.

### D.  The Instant Litigation

On January 22, 2013, Archura filed a GAO bid protest, challenging DHS's decision not to award it an IDIQ contract in the small business category.  AR 540-550.  GAO dismissed the protest because another unsuccessful offeror in the FirstSource II procurement had already filed a bid protest in this court.  See ST Net v. United States, No. 13-223C, 2013 WL 4128730 (Fed. Cl. Aug. 13, 2013); 4 C.F.R. § 21.11(b) ("GAO will dismiss any case where the matter involved is the subject of litigation before . . . a court of competent jurisdiction.").  Archura filed suit in this court on April 25, 2013.  In its amended complaint, filed May 30, 2013, Archura seeks, inter alia, injunctive relief to prevent DHS from awarding any FirstSource II delivery orders or task orders, costs in pursuing its protest, and other relief deemed proper.  Am. Compl. 12-13.  Briefing on the

parties' cross-motions for judgment on the administrative record was completed on July

24, 2013, and oral argument was heard on August 22, 2013.

## II. DISCUSSION

### A.  Standard of Review in a Bid Protest

The parties have cross-moved for judgment on the administrative record pursuant

to United States Court of Federal Claims Rule 52.1(c), which provides a procedure for

the equivalent of an expedited trial on the administrative record provided by the agency.

Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  Unlike summary

judgment standards, genuine issues of material fact do not preclude a judgment on the

administrative record.  Id. at 1355-56.  Questions of fact are resolved by reference to the

administrative record.  Id. at 1356.

In a bid protest case, the inquiry is whether the agency's action was arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law and, if so,

whether the error was prejudicial.  28 U.S.C. § 1491(b)(4) (2012) (adopting the

Administrative Procedure Act standard of 5 U.S.C. § 706); Glenn Def. Marine PTE Ltd.

v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013).  An award may be set aside if either

(1) the procurement official's decision lacked a rational basis or (2) the procurement

procedure involved a violation of regulation or procedure.  Savantage Fin. Servs., Inc. v.

United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010) (quoting Weeks Marine, Inc. v.

United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009)); Impresa Construzioni Geom.

Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  On the first

ground, contracting officers are entitled to discretion over "'a broad range of issues

confronting them' in the procurement process." Impresa, 238 F.3d at 1332 (quoting

Latecoere Int'l, Inc. v. United States Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir.

1994)); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir.

2000) ("The arbitrary and capricious standard applicable [in bid protests] is highly

deferential."). A disappointed bidder thus bears a "heavy burden" of showing the award

decision had no rational basis, and the court's inquiry focuses on the reasonableness of an

agency's explanation of its exercise of discretion. Centech Grp., Inc. v. United States,

554 F.3d 1029, 1037 (Fed. Cir. 2009). When a protester bases its claims on a procedural

error, the protester must show "a clear and prejudicial violation" of the relevant statutes

or regulations. Id. (quoting Impresa, 238 F.3d at 1333).

The amount of agency discretion is elevated in negotiated procurements, where the

contracting officer engages in what is "'inherently a judgmental process.'" Galen Med.

Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting Omega

World Travel v. United States, 54 Fed. Cl. 570, 578 (2002)). Thus, contract awards

based on best value are shielded from a court's second-guessing of what is "primarily a

matter of administrative discretion" in evaluating the relative merits of competing

proposals. Id. (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996)).

A bid protest proceeds in two steps, with the trial court first determining whether

the government acted without a rational basis or contrary to law, and then determining as

a factual matter whether the protester was prejudiced by the unlawful or arbitrary

conduct. Bannum, 404 F.3d at 1351. To establish prejudice, a protester must show that

there was a "substantial chance" it would have received the contract, but for the agency's

alleged error.  Id. at 1353; Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[A] protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").

**B.    Standing**

The "substantial chance" inquiry is the same standard the court employs to satisfy its jurisdictional standing requirement.  See Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006).  The Tucker Act vests this court with jurisdiction in protest disputes brought by "interested parties," 28 U.S.C. §1491(b)(1) (2012), a corollary from Article III's "concrete and particularized injury" requirement.  See Hollingsworth v. Perry, 133 S. Ct. 2652, 2659 (2013) ("[I]t is not enough that the party invoking the power of the court have a keen interest in the issue.  That party must also have 'standing[.]'").  Standing is a question of subject matter jurisdiction that cannot be conceded to by a party.  S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1328 n.3 (Fed. Cir. 2005).  To prevail in a bid protest, the "substantial chance of award" standard is therefore applied twice, first to establish a plaintiff's standing to bring the case, and subsequently to an evaluation on the merits and the effect of errors in the procurement process on the offeror.  See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 695-96 (2010) (differentiating between "allegational prejudice" and "APA prejudice" both of which apply the "substantial chance" test).  This preliminary standing inquiry serves to dismiss the proposals that would not have stood a substantial chance of award, even if all of the

errors alleged by the plaintiff are true.  See id.; Orion Tech., Inc. v. United States, 704
F.3d 1344, 1350 (Fed. Cir. 2013) ("mere timely submission of a proposal, no matter how
defective" will not confer standing).  In some cases, however, the analyses become
intertwined, such that consideration of the merits will relate back to the initial standing
inquiry.  See Comint Sys. Corp. v. United States, 700 F.3d 1377, 1384 (Fed. Cir. 2012).

On July 19, 2013 the court ordered supplemental briefing on the question of
standing.  Order, ECF No. 57.  In this case, the government filed a brief explaining that it
does not contest Archura's standing because, assuming the truth of all of Archura's
allegations with regard to DHS's pricing evaluation and Archura's rejection based on the
incomplete matrix, Archura would have had a substantial chance of award.  See Def.'s
Reply 15.  The government, however, strongly challenges Archura's ability to show it
was prejudiced by the agency's alleged errors, claiming that on the merits Archura did
not have a substantial chance of award due to its significantly higher price.  Def.'s Reply
17-18.  The court agrees with the government's reasoning and for those same reasons
finds that Archura has standing to bring its protest.

C.     **The Parties' Cross-Motions for Judgment on the Administrative
       Record**

In this case, Archura protests DHS's elimination of its proposal as "fundamentally
flawed" for failing to include a brand/model name of one type of printer in its Sample
Delivery Order Pricing Matrix.  Archura states that DHS had a duty to seek clarification
for what it argues was an "obvious clerical error," and argues that DHS's failure to do so
violated the solicitation and resulted in an arbitrary and capricious decision.  Archura also

argues that it had a substantial chance of award because, but for a latent ambiguity in the solicitation, it would have submitted more competitive pricing.  Archura contends, given the nature of the IDIQ contract, that DHS placed too much emphasis on price when evaluating offers.  The government responds that DHS was under no duty to seek clarification and did not abuse its discretion in declining to do so. The government also posits that the solicitation was unambiguous with regard to price, and that Archura's significantly higher price properly precluded it from award.

For the following reasons, the court finds that even if the government erred by eliminating Archura's proposal from consideration for award, Archura was not prejudiced by the government's error because it did not have a substantial chance of award, given its significantly higher price.  In this connection, the court further finds that Archura's arguments regarding the government's consideration of price are without merit.  The court also finds that the solicitation did not contain a latent ambiguity and that DHS evaluated price in accordance with the terms of the solicitation.

1.     DHS Erred In Rejecting Archura's Proposal When It Awarded to Other Offerors, Despite Similar Gaps in Brand/Model Information.

Archura argues that DHS's decision to eliminate it from consideration for award was arbitrary, capricious, an abuse of discretion and not in accordance with law because Archura's failure to provide brand name and model information was plainly a clerical error that DHS should have allowed Archura to correct.  Archura relies on several FAR provisions to argue that the government was required to seek a clarification from Archura regarding missing brand name and model information on Archura's sample price matrix.

Archura also points out that there were other offerors who were awarded IDIQ contracts, in spite of omitted brand and model numbers, where they provided only brand names, or simply listed the brand name as "Various." For example, * * * omitted brand and model information in two cells, stating "Various" for tape supplies in item 3.4.3 and projectors in item 5.5.2. AR Tab 28(d). * * * left off model numbers in two categories, filling in "* * *" for item 3.4.3 and "* * *" for a USB memory device in item 5.3. AR 28(j). * * * also omitted model numbers, answering "* * *" for item 3.4.3 and "* * *" for the memory devices described in item 5.3. AR 29(g). All three of these offerors were awarded IDIQ contracts in the small business category. AR 1096. Archura maintains that the agency could not hold these offerors to specific models either, and therefore should not have rejected Archura's proposal for one blank cell, while overlooking a similar mistake on the part of three awardees.

The court recently reviewed these arguments with regard to the same solicitation (although different small business categories) in ST Net, 2013 WL 4128730, at *7-10. In ST Net the court determined that the government did not err in rejecting ST Net's proposal for consideration in the best value tradeoff where ST Net had failed to include price and brand/model information on the matrix. Id. at *10. Plaintiff argues that ST Net is distinguishable from the present case and the court agrees.

Unlike in ST Net, the court in this case is faced with a situation involving disparate treatment among offerors. In the small business category within which Archura was competing, three offerors received award despite their unclear responses in the brand/model cells. While Archura undisputedly left a brand/model cell blank, a blank

cell has the same effect as a cell that contains the word "Various," which does nothing to bind the offeror to a specific item.  Yet, two offerors that used the word "Various" received awards.  This leads the court to conclude that the government arbitrarily treated Archura differently when it failed to consider Archura's proposal in its final best value determination.  See Chenega Mgmt., LLC v. United States, 96 Fed. Cl. 556, 585 (2010) ("This court has held that unequal treatment claims are the quintessential example of conduct which lacks a rational basis.") (internal quotations omitted).  Nonetheless, for the reasons that follow, the court finds that the government's failure to formally consider Archura in the best value evaluation did not prejudice Archura and thus Archura is not entitled to relief.

2. Archura Was Not Prejudiced by the Agency's Decision to Exclude It Based on the Missing Brand/Model Name, Because It Did Not Have a Substantial Chance of Award.

As discussed above, to prevail in this bid protest, Archura must demonstrate prejudice by showing that there was a "substantial chance" it would have received the contract award, but for the alleged error in the procurement process.  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003); Linc Gov't Servs., 96 Fed. Cl. at 696.

Here, there is no question that Archura's total price was significantly higher than the price of the contract awardees.  The awardees' prices ranged from * * * to * * * with an average price of * * *.  As noted above, Archura's price of * * * was over * * * million (or 29%) more than the highest-priced awardee, and over * * * million (or 73%) more than the average awardee's price:

Table 1:  Offerors' Technical Scores and Prices (AR 970)

* * *

AR 970.  The table demonstrates that Archura's price was completely outside the range of the potential awardees.

In addition, the record also demonstrates that there were many offerors with proposals that were equal or superior to Archura's.  AR 962.  In the source selection authority's decision document, the SSA discussed tradeoffs between price and technical scores, finding that although certain offerors' proposals were more expensive than others, their technical scores warranted a price premium.  AR 1103-09.  In this connection, the most highly rated offeror on technical ratings, * * *, received three scores of "Excellent" – the highest score possible in each category – and proposed a price of * * *.  AR 1106-07.  Although this price was higher than other awardees, the SSA determined that * * * warranted a premium of $19 million.  AR 1107 ("As * * * represents significant technical merit over [other offerors], it warrants the price premium of approximately * * *, [and] is determined to be the best value to the Government . . . .").  AR 1107.  In contrast to * * *, Archura received only 2 out of 3 "Excellent" scores.  Archura argues that with only 2 "Excellent" scores the government would have been willing to pay a premium of * * * – more than double that of * * *'s premium.  The court cannot agree.  The court acknowledges that it cannot appoint itself evaluator to determine where technical and price tradeoffs are warranted, see E.W. Bliss, 77 F.3d at 449, however the record reveals that it was not arbitrary for the government to conclude Archura fell outside of the range of potential awardees, even given its technical score.

In Archura's case, the government's graph illustrating the data points of the small business offerors being considered for award is especially illustrative of the similarities of the successful firms.  The aberrant price spike that would represent Archura's price of * * *  does not fit within the grouping of awardees.  In fact, Archura's high price * * * the bounds of the chart itself:

Graph 1: Small Business Offerors Considered for Award (AR 976)

\* \* \*

AR 976.  In view of this evidence, including the statements at the debrief, the court concludes that Archura did not have a substantial chance of award.  See e.g., Allied Tech. Grp. v. United States, 94 Fed. Cl. 16, 24, 46 (2010) (protester's technical proposal was slightly more favorable, but "whopping price difference" resulted in agency reasonably selecting less expensive proposal, even though price was least important criterion); Elec. Data Sys., LLC v. United States, 93 Fed. Cl. 416, 436, 439 (2010) (finding no prejudice where "error was dwarfed by huge price differential" of $50 million, representing nearly a 29% spread); Analytical & Research Tech., Inc. v. United States, 39 Fed. Cl. 34, 54 n.19 (1997) (no prejudice where protester's price was approximately 35% higher than awardee's).  As Archura cannot establish prejudice from DHS's decision to exclude it based on its incomplete matrix, it cannot succeed in its protest.

   3.   Archura's Challenges to the Solicitation and DHS's Evaluation of Price
        Do Not Alter the Lack of Prejudice Determination.

In an effort to show that its pricing was competitive and thus it had a substantial chance of award, Archura argues that DHS's solicitation instructions were misleading

24

and latently ambiguous in violation of FAR § 15.303 and § 15.304, and that the agency did not adhere to the published evaluation criteria in its price evaluation.  See Pl.'s Mot. 12-20; Supp. to Pl.'s Mot. 8-11.  These arguments are without merit for the reasons that follow.

Archura first argues that its higher prices should not be relevant in evaluating prejudice because the pricing instructions in the solicitation were ambiguous.  According to Archura it was not clear from the solicitation whether (1) offerors were intended to compete on the basis of lowest price during the IDIQ source selection process, or the subsequent delivery orders, and (2) whether the agency wanted "floor" or "ceiling" pricing in the Sample Delivery Order Pricing Matrix.  Pl.'s Mot. 13-14.  Archura argues that it read the solicitation to mean that price was only relevant in connection with delivery orders and thus it was not required to submit a best and lowest price for purposes of securing an award.  Id. at 14.  Archura contends that the role of price in making an award was latently ambiguous in that it did not become aware of the defective instructions until after award in its debrief.  Id. at 15-16.

In response, the government contends that the solicitation is not ambiguous with respect to pricing, and even if it were, Archura waived its challenge to the terms of the solicitation by not voicing its concern prior to the IDIQ contract awards.  The government notes that the solicitation clearly stated that price was one of the four evaluation criteria, and that submissions should contain "the [o]fferor's best terms from a technical and price standpoint."  AR 264.  It also maintains that there was no ambiguity with respect to ceiling or floor pricing, because the solicitation stated in several places

that offerors' quotes in their matrix would be considered in making awards and that price

would become more important the closer technical ratings.  Finally, the government

argues that because all of Archura's alleged ambiguities are based upon plain terms of the

solicitation, Archura needed to seek a clarification before contract award under <u>Blue &</u>

<u>Gold Fleet, L.P. v. United States</u>, 492 F.3d 1308, 1315 (Fed. Cir. 2007).

> (a) <u>The solicitation was not ambiguous, and any objections were in</u>
> <u>any event waived.</u>

The court agrees with the government that the solicitation did not contain a latent

ambiguity and, further, that any confusion on Archura's part regarding the meaning of the

solicitation was plain from the face of the solicitation and should have been challenged

before award.

A contract is ambiguous only when its language is susceptible to more than one

reasonable interpretation.  <u>Banknote Corp. of Am. v. United States</u>, 365 F.3d 1345, 1353

(Fed. Cir. 2004); <u>A-Transp. Nw. Co. v. United States</u>, 36 F.3d 1576, 1584 (Fed. Cir.

1994).  <u>Compare</u> <u>Hunt Constr. Grp., Inc. v. United States</u>, 281 F.3d 1369, 1372 (Fed. Cir.

2002) (special notice advising bidders to seek applicable sales and use tax exemptions did

not introduce ambiguity to plain instructions of FAR § 52.229-3 that contract price

includes all applicable taxes and duties), <u>with</u> <u>Statistica, Inc. v. Christopher</u>, 102 F.3d

1577, 1582 (Fed. Cir. 1996) (RFP was "at most ambiguous" where protester and awardee

had differing, but both reasonable interpretations as to whether use of Wage

Determination figures was a mandatory requirement).  Once a court concludes that the

contract language challenged by a protester is ambiguous, it "must then determine

whether that ambiguity was patent so as to impose a duty to seek clarification [prior to contract award], or only latent." Interwest Constr. v. Brown, 29 F.3d 611, 614 (Fed. Cir. 1994). Whether an ambiguity is patent or latent is a question of law, and a determination to be made on a case-by-case basis. See Interstate Gen. Gov't Contractors, Inc. v. Stone, 980 F.2d 1433, 1435 (Fed. Cir. 1992). A patent ambiguity is one that is "obvious, gross, or glaring." Fulcra Worldwide, LLC v. United States, 97 Fed. Cl. 523, 538 (2011); H & M Moving, Inc. v. United States, 499 F.2d 660, 671 (Ct. Cl. 1974). The distinction is critical for the purpose of waiver, since "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards[.]" Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 565-66 (2012) (quoting Blue & Gold Fleet, 492 F.3d at 1315).

Here, it is clear from a review of the record that the solicitation stated multiple times that price would be evaluated in making the award and offerors were urged to put their best terms forward. AR 264 ("As proposals approach equal ratings as a result of the non-price evaluation, price will become more important in making the award determination."); id. ("[A]ll proposal submissions should contain the [o]fferor's best terms from a technical and price standpoint."); AR 482 ("The quotes provided herein [on the Sample Matrix] will be used for pricing evaluation purposes."). In view of these examples, Archura's contention that price competition was to be relevant at only the delivery order level is plainly unsupported. Contrary to Archura's suggestion, the

solicitation unambiguously stated that offerors would be evaluated on price and that they needed to offer their best terms.[12]

Nonetheless, even if Archura could establish an ambiguity within the solicitation's terms, such ambiguity would be patent, rather than latent. The court finds that Archura's confusion regarding the role price would play in the selection process was plain from the face of the solicitation. The solicitation clearly stated in numerous places that the agency would consider price quotes in the matrix to be ceiling prices for future delivery orders. See e.g., AR 192, 262, 267. The same solicitation stated that matrix prices would be used together with labor rates to determine best value and that "price will become more important" as proposals "approach equal ratings." AR 264. If Archura was confused as to how price was to be evaluated and the significance of providing ceiling prices on its matrix, it should have sought clarification before award, and waived its right to do so after. See Blue & Gold Fleet, 492 F.3d at 1313.

For these reasons the court finds that DHS did not violate the FAR by its use of an ambiguous solicitation, and Archura waived its right to challenge the pricing terms.

        (b) DHS's statement regarding best value and price in the debrief was not arbitrary and capricious or inconsistent with the terms of the solicitation.

Archura next argues that even if it is held to the "ceiling" prices on its matrix, DHS erred in concluding that Archura's price was too high because price

---

[12] The court also rejects as without merit Archura's argument that the solicitation was ambiguous as to whether the agency wanted "ceiling" or "floor" pricing, as it plainly stated multiple times that ceiling prices were to be submitted, and it evaluated the offerors' prices as such. See e.g., AR 192, 262, 267.

"reasonableness" was of limited importance.  Archura argues that had DHS properly considered price, Archura's proposal should have been considered best value.

The government responds that the debriefing document never mentioned price reasonableness, but only that Archura's proposal was incomplete, noncompliant, and overpriced.  Id.  The government argues that DHS simply concluded that Archura's offer was so significantly higher than any of the awardees that it simply could not represent best value.

The court agrees with the government that DHS did not violate any term of the solicitation or reach an arbitrary or capricious result when it noted that Archura's price would not represent best value.  Where, as here, Archura's price proposal compared so unfavorably with those who received awards, and Archura could not reasonably claim that its technical ratings (which did not include 3 excellents) justified its price premium, DHS's conclusion that Archura's proposal would not represent best value was not irrational.  In light of the fact that DHS also followed the unambiguous terms of the FirstSource II solicitation, Archura has failed to establish that it was prejudiced by DHS's failure to consider its proposal in the first instance.

## III.    CONCLUSION

For the foregoing reasons, the government's motion for judgment on the administrative record is **GRANTED**, and plaintiff's cross-motion is **DENIED**.[13]  Each party shall bear its own costs.  The Clerk is directed to enter judgment accordingly.

---

[13] Because the court finds that Archura was not prejudiced by any potentially erroneous actions of DHS, the court has no occasion to evaluate whether injunctive relief is appropriate.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge